Good morning, Your Honors. May it please the Court, Ricardo Prieto, appearing on behalf of Appellants. This case is an employment action brought against Alaska General Seafoods, who I'll refer to as AGS, under the FLSA as a collective action and under Alaska Wage and Hour Act as a Federal Rule of Civil Procedure 23 class action. Now, to be clear, neither class was certified as the district court, granted summary judgment, mooting plaintiffs, motion to certify a collective, and motion to certify a Rule 23. Now, this happened, although at the hearing where the Court considered summary judgment and all the pending motions involving the class actions, the Court had initially noted that it would at minimum certify the FLSA class but would reserve judgment on the Rule 23 class. The issues before the Court today are as follows. Did the district court err under the FLSA and Alaska state law in finding that fish processing plant workers who were confined to their employer's small housing facility were not entitled to wage payment for all hours in the day, including one, hours when the worker's sleep was actually or subject to interruption, two, hours when the employer engaged the workers to wait to be called into work during their evening hours, and three, hours when the workers were on call or on standby or on waiting time. The facts in this case are important because they're unique as far as it relates to the level of restrictions that took place. So I'll go over those briefly. Well, didn't their CBA indicate that the plaintiffs agreed and understood that they would not be compensated for their on-call and sleep time? Well, so the CBA did not contemplate, did not cover any of the claims that are being brought here, and the Court agreed to that, and the Court had held that the CBA did not contemplate any of the claims here. Generally, for FLSA claims like this, those claims are standalone claims. They're claims that you're entitled to bring under that statute, and so the CBA could add rights under that agreement, but it could never take away. So there was no specific mention as to these sleep time claims and waiting claims. There was a system in place to address on-call issues, but the problem here is that that on-call system that was in place addressed actual interruptions, not perfectly, but addressed some of those actual interruptions, but it never addressed being subject to interruption, and that's because these folks were constantly engaged, Your Honor. They had nothing else to do. They were in the middle of rural Alaska. Do you have, I mean, there were other scenarios. Here, the restrictions were because of COVID while they were confined to the campus, but there were other restrictions where people just logistically are confined, like people who work on a platform out in the sea or in, you know, some other remote area where they're going to logistically be confined. Do you have any precedent in one of those kinds of analogous situations where overtime of the sort you're claiming here was recognized? Well, so the issue here is that Apelli argues that because of the circumstances related to COVID and the governmental mandate that applied at that time, that there should be an out and they should have a pass as to their obligations to compensate folks who are restricted to the level that these employees were. The difference here, Your Honor, and I believe you may be referring to the Rousseau case. It's a Fifth Circuit case where there were workers on an oil rig that were subject to some restriction. The difference here, though, is that added to the fact that you've got folks that are geographically in an area that's completely isolated, there was this fear, especially at this time. This was 2020. We were trying to figure out exactly the extent of how this COVID-19 worked. You had no access to a rec room that was closed down. You, these individuals couldn't socialize. They were to go to work, and then they were to go back to their bunk. Although there's some instances that Apelli's arguing show these folks had some leeway as to the personal activities that they could engage in, the rule and the policy was that you weren't to drink alcohol, you weren't to leave. You were to stay confined in this place, surrounded by barbed wire and surrounded with guards with signs posted outside that if you crossed the line, you would be terminated. I thought they could drink alcohol. They could not drink alcohol? They could not. That was a violation of the rules there. And so Apelli's arguing, well, this is proof that these folks are free to do as they wish. And so, admittedly, there were some violations of those rules, but they were minimal. And, again- Wait, I want to be clear. Were they or were they not allowed? They were not allowed. They were not allowed. Correct. And so the- I thought the evidence did have, I thought the record did have evidence that people did sort of drink regularly, and they weren't terminated for it. Well, they weren't, and there were some, there was some instances of drinking. I don't recall the record showing that it happened regularly, but the rule in itself was, regardless of whether they were terminated or not, the rule was that you were not to drink alcohol. But the practice was that they did not? The practice is that you're not to do that. But, yes, admittedly, it did happen occasionally. Where were they getting the alcohol from? If it's a closed campus, somebody must have been bringing it on. Yeah, my understanding is that you would have folks that would come in and out, whether it was by plane or vehicle, and they'd probably bring some of it with them, Your Honor. But that's just me making that assumption. But I take it- Go ahead. I take it the answer to my question before about analogy, you explain why the platform situation is distinguishable, but I take it the answer is that there isn't an analogous situation where a claim like this has been recognized. I mean, I understand you say it's not analogous, but there isn't a platform case or another geographic isolation case where this kind of an overtime claim has been recognized. Am I wrong on that? No, Your Honor. This is unique in the sense that it happened during COVID-19, and there was this level of restriction on the employees. Okay. But the employees continued to come back year after year, though. Yes, Your Honor, they would. Understanding that they were not getting paid for on-call. Well, that was not the evidence here, and the testimony from the appellants was that they were to be paid for that time, and there was a call-out system. Again, an imperfect system. It only tracks some actual interruptions. But that call-out system is in place because the understanding was that you would be paid for your scheduled time, and if any work was to happen outside of that scheduled time, well, then presumably this call-out system would trap that time, and you'd be compensated for it. The reality is, however, that because these folks were subject to, they were engaged to wait the entire time, that call-out system just simply didn't work. It didn't compensate these folks for the 24 hours, as we argued in our briefing. I'm sorry. I misunderstood your answer to my question. My question was whether or not these employees kept on coming back even though they were not being paid. They did keep coming back. Yes, Your Honor. Okay. So they understood what was going to be paid and what was not going to be paid. They understood that they would be paid for some of the time. They objected to that, certainly, but they were aware that this was an ongoing issue, for sure. What does the record show about how often people were called to duty and off hours? So the number of call-outs was not high. We did submit to the District Court a supplemental that this case is more like the Brigham case, where when you have evidence before the court showing that employees are not free to engage in personal activities, the focus on the call-out element under Owens becomes more of a neutral factor. But they were allowed to engage in personal activities. I think there's a laundry list of examples of the things that they were able to do. I mean, it was limited under the circumstances where they were at, but they could do those things. Your Honor, I don't think it's our position that they were unable to engage in any personal activities. It's our position that those personal activities constituted a small portion of their time. The examples that are cited in Appellee's briefing, if you think about it, only over two and a half seasons constitute maybe six or eight examples for a number of individuals. So the testimony put on my appellants is that the majority of the time they were there to work, because that's all that you could do, is work. And that was the expectation, to remain available to work. You were in a place where only a few individuals could address certain specific issues, like a machinist, for example. There were maybe one or two machinists available that could repair a machine, and these machines are running 24-7. So each person was a cog to this will, and they had to remain available to keep everything working so they could continue to process fish. And so Appellee's closed campus policy, as I've mentioned, was intended for the benefit to ensure productivity and to avoid the spoliation of fish and fish products. As I mentioned before, Appellee argues that its closed campus policy was in response to a governmental mandate related to COVID, but keeping workers from getting sick and available to work ultimately impacts productivity and is for the benefit of the employer. The Appellee characterizes the claims here from Appellant as novel. However, there's nothing novel, beyond the fact that this happened during a pandemic, during a COVID pandemic, there's nothing novel about these claims. Sleep time claims have been addressed by this court in Owens and in other cases since Owens, and waiting to be engaged for work, those are all claims that have been around for a long time in these wage and hour cases. The issue here was is that you have a lot of competing evidence, as I pointed out, as to whether or not these folks were truly free to engage in their personal activities off the clock or if they remain engaged to wait. And so when you have a close call, as the district court in this case said at the hearing, this is a close call, and ultimately it came down to a three versus two scorecard when taking the Owen factors into consideration. This is a case that should have been allowed to proceed to trial, especially when you consider that one of the three factors that went the Appellee's way really should have been a neutral factor as discussed by this circuit in Brigham. Do you want to save any time for rebuttal? Two minutes, Your Honor. If there aren't any questions, I'll go ahead and do that now. All right. Thank you, Counsel. So we'll hear argument now from Ms. Heikkila. Did I pronounce that correctly?  Heikkila. Heikkila. All right. Thank you. Good morning. Cara Heikkila on behalf of the Appellee Alaska General Seafoods, or AGS. I want to address some of the points that were just raised. There is no case, there's no authority that's been cited. I've been asking for that case since the scheduling conference before the district court. So we now have confirmation on that. As to alcohol, there was some testimony that alcohol was not allowed. We don't have a written policy on that. But the actual testimony is that in particular during the pandemic, people had alcohol. They had it in their room fridges. I think Jerry Ross testified he transported it up. So that's barged up with your personal items for the year. Mr. Bowman testified he drank daily during the pandemic while on campus. And the runner could get alcohol. So there was a runner that went to town, was the one person allowed to go to the store. But the personal activities were really limited. I mean, there was they didn't have television. Sounds like the Internet was very spotty. They couldn't go out of town. It was very limited in terms of personal activity that they had. One, those are limited in any instance in any season. The Internet is spotty there. Television is limited. Phone service goes down as everyone gets in for the season because there are too many users on the system. I think one of the fallacies of this case is that kind of the curtain went down when this policy was instituted and suddenly everything changed and really nothing changed. Most people don't leave the campus because they don't have access to vehicles, especially during the production part of the season. These folks are working 18-hour days. When you get off shift, you are showering, you're eating, and maybe you're visiting with family and you're sleeping. And that's the reality of this job. It's the job. They all testified, they loved, and they went back to season after season. I'd like to spend my time today on binding Ninth Circuit case law on the application of 29 CFR 785.23. That binding precedent is the Brigham case. The undisputed facts before this court and time permitting a review of those two first Owens factors. According to the testimony of appellant Cody Flaherty, and this is at ER 390, if I'm not working but you're forcing me to stay somewhere, I see that as you need to compensate me for that time. Under longstanding, well-established Ninth Circuit case law, it's not about whether Cody Flaherty could leave the AGS NACNC campus during the pandemic, but whether he and the other employees could enjoy personal activities while off duty and while on the campus. That's really the singular issue before this court. It's a simple analysis of the undisputed facts, which is based entirely on the testimony of the employees under the Owens factors, the actual and constructive agreements of the parties, and the application of that plain language of section 785.23. Common sense has to prevail here, not this after-the-fact attempt to shoehorn a government-mandated policy into a wage-and-hour compliance problem for this and other industries in Alaska that were complying with these mandates. AGS asks that the thorough and well-reasoned decision of the district court be affirmed. AGS submitted a Rule 28J letter and identified the Kennedy and Hunt cases' recent authority out of the Ninth Circuit. The appellants responded, and I'd like to pick up where the parties left off from those letters. The employees argue that Hunt is inapplicable in part because there are disputed facts, and then what we heard again today, this idea that somehow AGS is making a pandemic pass or a pandemic exception argument. I would submit that Hunt is the most on-point case to the employees' novel closed-campus claim, and the same reasoning that resolves Hunt resolves the employees' claim here under section 785.23. In Hunt, the employee argued that the more general waiting time regulation applied as opposed to the very specific training regulation that was ultimately decided against the employee. They also argued, quote, the employees were always on call and tethered to the hotel, very similar to the complaints we hear here. The Hunt panel rejected that argument on a plain-language basis, noting the Ninth Circuit had similarly rejected that argument in the Brigham case. The Brigham case was a remote-site employee case where the individuals were living on company premises. And in that case, the Ninth Circuit applied section 785.23. AGS is simply pointing out that this is now additional authority in Hunt, recognizing that plain language, the more specific regulation over the more general rule of construction, supports applying that regulation here. That's binding precedent under Brigham. The parties in Hunt did not make a pandemic exception argument, not in the briefing, not in oral argument, nor did the Ninth Circuit address a pandemic exception in its memorandum opinion. I can only guess, because I've heard this for several years, that any time a defendant raises the idea of the pandemic, that somehow the defendant is then asking for a pass. AGS raised this simply as a matter of common-sense context for the first two factors in the Owens test, and in particular, that geographic restriction on movement. Here, the district court weighed those first two factors, but expressed some skepticism in awarding those to the side of the employees because the geographic restrictions were, in effect, based on the pandemic. And it was debatable, she said, whether the geographic restriction was excessive. The extenuating circumstances of the pandemic have to be considered here because the practical reality is these restrictions were in place whether they were on campus or off campus, whether they were in Alaska or whether they were home. For the 9 to 10 months each year, they were home in the states of Washington and California. Those restrictions had nothing to do with their employment. I believe the Ninth Circuit could have resolved this question entirely on the plain language of the training regulation, but chose to add the last paragraph to that decision to clarify that just because the defendant asked Mr. Hunt to remain in a hotel room to comply with a COVID mandate policy did not make his off-duty time in that hotel room compensable. The Ninth Circuit in Hunt used the pandemic as common-sense context for its opinion and certainly did not, as has been suggested, reject an argument to apply a COVID exception. Ultimately, the Hunt panel recognized it was bound by longstanding Ninth Circuit precedent in Brigham, as is this panel, and correctly found that non-work time at a hotel during the pandemic was not compensable. I want to turn to the undisputed facts. We're here on a posture of summary judgment and dismissal. The employees must go beyond the pleadings and identify specific facts that show there are genuine issues for trial. I want to be clear that the summary judgment record here is limited. It's ER 2 through 945, and then there were some supplemental post-hearing submissions at 2378 to 2383. That summary judgment record included the full deposition transcripts of the named and opt-in plaintiffs, their written discovery answers, the collective bargaining agreements, and their time records. There are two AGS declarations in the record, Dave Miller and Liz Best. Those declarations were submitted purely as background information about the mandates and then AGS's response to those mandates. Those facts are not in dispute. So this is not a case where there are competing declarations and deposition testimony on the Owens factors. The Owens factors are based entirely on the record of the employee's testimony. The other thing I want to point out is there are several references in the brief to allegations from the second amended complaint. But when you actually dig into the record, those statements and deposition testimony really don't support the allegation, and I can give you an example of that. The opening brief at page 7 says, AGS implemented a closed campus policy which severely restricted the employee's ability to enjoy their personal time. Footnote 5 then cites to those community and workforce protection plans that AGS and other seafood plans were mandated to put in place. It also cites to the record where the photos exist of the AGS closed campus. There's no dispute that the plans were put in place and the campus was closed and signs were put up. But those facts are not evidentiary support for the idea that their time was severely restricted and they could not enjoy personal time while on campus. That they couldn't leave the campus is not the end of the analysis. It is the beginning of the analysis. Another example is at page 9 of the opening brief. Employees were required to remain engaged to work at all times, effectively on duty for the 24-hour period. That idea of a 24-hour schedule is repeated in the pleadings, and it's an attempt to kind of voice this case into a different regulation as opposed to the plain language of 785.23. Footnote 13 largely cites Keegan Flaherty's testimony, where he said things like, I'm not sure I'm designated on call. He thought they were always supposed to be ready to go back to work. He was asked about an e-mail between his brother Cody and the union where there's kind of this conclusion. If you have to stay on the property, you know, should you be compensated? And he answered, I believe Cody is just reciting what the FLSA says. You can't simply proclaim you're on call and ignore the Owens test as to the compensability of that time. Keegan's testimony doesn't support any of the Owens factors. It certainly doesn't support what the brief contends, which is, again, this idea that they were on duty 24 hours a day. The best example of that is from the Brigham case. There were two types of shifts in Brigham. There was a maintenance shift where they had a set scheduled shift three days a week, and then one day a week they had what was called a duty shift where they were on duty literally 24 hours a day. They were compensated 10 hours for that day. The dispute in that case was over the duty shift, not the maintenance shifts where they worked like KGS employees. A set schedule, by the way, a set schedule that they all admitted there was someone else doing their same job when they were not at work. This testimony ignores Keegan's admissions that he was never called back to work, not in 2019, 20, 21, or 22. He said if he wasn't available, someone else could cover the shift, and he wasn't deprived of any sleep. These are really arguments of counsel unsupported by the record. Of course, arguments of counsel do not create material facts capable of defeating an otherwise valid motion for summary judgment. Ninth Circuit authority is longstanding. Owens from 1992, a similar fact pattern with mechanics who were called back on occasion to fix equipment. Berry in 1994, analysis of Owens, decision in favor of the employer. Brigham in 2004, analysis of Owens, an application of 785.23. And while not binding, certainly persuasive Fifth Circuit case of Rousseau, the recent Hunt decision of the Ninth Circuit favorably siding Brigham. And again, while not binding, certainly of note the Moody case, a 2018 Supreme Court of Alaska case interpreting the Alaska Wage and Hour Act, applying Owens and Section 785.23 to a pilot living on the employer's premises at a remote fishing lodge in Katmai National Park, which, by the way, is close to Naknek. When you fly into King Salmon to get to Naknek, it is the gateway to the park. The court cannot ignore longstanding binding precedent and judicially expand the FLSA and the Alaska Wage and Hour Act to require that all non-work time during the pandemic year on the company property where the employees lived should be compensable. That's, of course, what Mr. Flaherty wishes. Citing Brigham, that's a proposition that settled case law and the administrative guidelines clearly reject. ATS respectfully asks that the district court's decision be affirmed. All right. Thank you, counsel. We'll now hear rebuttal. Your Honors, I'd like to begin with addressing the Hunt case. The Hunt case, which was an unpublished decision, was concerning Regulation 29CFR 553.226C. That's a regulation that applies only to federal employees. And specifically says that employees in fire protection activities who attend a fire academy are not considered to be on duty during the times when they're not in class or training. I think counsel's point is that they added this last paragraph at the end where they talked about Brigham, which was a .23 case. Right. But I think the court, from what I recollect in Hunt, found that that regulation itself was dispositive of the issue. And so it was different from the situation that we have here where there's a discussion concerning whether or not the employees were free to engage in personal activities. And there is evidence in the record, Your Honors. In our brief on page 9, there's deposition testimony from Mr. Bauman referencing what the work conditions were like in 2020. And he says, I'll quote, I mean, we were restricted to campus. So we were basically, you know, at work all the time for those months. Footnote 13 in our opening brief has additional deposition testimony. So there is evidence in the record that these employees were working continuously throughout the day and were not just drinking beer and going on treasure hunts, as the appellee wants this court to believe. As a final point here, I did want to say there is a difference between what the campus looked like during COVID and when it didn't. The rec room was closed, for example. There were policies specifically dealing with socializing and not socializing and not seeing family. Those were restrictions that were not in place during non-COVID years. And it looks like I'm out of time, Your Honors. All right. Thank you. Thank you, counsel. The case just argued will be submitted.
judges: COLLINS, VANDYKE, MENDOZA